**CORRECTED**

# In the United States Court of Federal Claims

Nos. 19-1596, 19-1942, 21-87, 21-546, 21-2143, 22-10
Filed: June 10, 2026

|  |  |
|---|---|
| BASIL AGAPION, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| THE UNITED STATES, | ) |
| | ) |
| Defendant; | ) |
| | ) |
| CHAPMAN SPRING/GARDEN, LLC *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| v. | ) |
| | ) |
| THE UNITED STATES, | ) |
| | ) |
| Defendant; | ) |
| | ) |
| GOODHUE PARTNERS, LLC, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| THE UNITED STATES, | ) |
| | ) |
| Defendant; | ) |
| | ) |
| FAYE K. MOHORN, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| THE UNITED STATES, | ) |

|  |  |  |
|---|---|---|
| Defendant; | ) |
|  | ) |
|  | ) |
|  | ) |
| HELEN C. WOOD, LLC, *et al.*, | ) |
|  | ) |
| Plaintiff, | ) |
|  | ) |
| v. | ) |
|  | ) |
| THE UNITED STATES, | ) |
|  | ) |
| Defendant; | ) |
|  | ) |
|  | ) |
| MATTHEW K. BLACK, *et al.*, | ) |
|  | ) |
| Plaintiffs, | ) |
|  | ) |
| v. | ) |
|  | ) |
| THE UNITED STATES, | ) |
|  | ) |
| Defendant. | ) |
|  | ) |

**TRIAL OPINION & ORDER**

This case marks the third set of plaintiffs in this "rails-to-trails" saga that have proceeded to trial seeking just compensation for the value of their property that was taken when a 3.1-mile railroad corridor was converted for public recreational trail use. The government does not dispute that the plaintiffs here collectively own 21 parcels of land adjacent to and underlying the former railroad right-of-way in Greensboro, North Carolina. *See* United States' Post-Trial Br., ECF No. 280 at 1. Because liability is undisputed, the Court must determine whether the plaintiffs are entitled to just compensation and, if so, the amount of compensation. *See Agapion, et al. v. United States*, Case No. 19-1596, ECF No. 20 (*Agapion*); *Chapman Spring/Garden, LLC v. United States*, Case No. 19-1942, ECF No. 11 (*Chapman*); *Goodhue Partners, LLC et al. v. United States*, Case No. 21-87, ECF No. 10 (*Goodhue*); *Mohorn et al. v. United States*, Case No. 21-546, ECF No. 12 (*Mohorn*); *Helen C. Wood, LLC, et al. v. United States*, Case No. 21-2143, ECF No. 17 (*Wood*); *Black et al. v. United States*, Case No. 22-10, ECF No. 19 (*Black*).

Plaintiffs seek $10,747,334 in compensation, plus delay damages, attorneys' fees, and litigation expenses. *See Agapion*, Pls.' Post-Trial Br., ECF No. 277 at 13–15.[1] By contrast, the

---

[1]    Plaintiffs' pre-trial submission estimated the total damages as $10,757,218. *See* Pls.' Am. Mem. of Contentions of Fact and Law, ECF No. 241-1 at 15, 96. However, plaintiffs' post-trial brief requests a

government contends that plaintiffs are owed nothing for the value of their land that was taken to construct public recreational trails. *See Agapion*, United States' Pre-Trial Br., ECF No. 195; United States' Post-Trial Br. For the reasons explained below, the Court finds that plaintiffs are entitled to $8,914,102 in just compensation for the taking of their property.

## I.    Background

### A. The Rail-Banking Program

Rails-to-trails cases are governed by the National Trails System Act ("Trails Act"), Pub. L. No. 90-543 § 8(d), 82 Stat. 919, 925 (codified as amended at 16 U.S.C. § 1247(d)). Under the Trails Act's rail-banking program, the government may preserve historic railroad corridors for potential reactivation following a railroad company's decision to abandon the rail line. *See Preseault v. I.C.C.*, 494 U.S. 1, 5–6 (1990) (*Preseault I*). In the interim, these corridors are converted into recreational trails for the public. *Id.*; *see also* 49 C.F.R. § 1152.29(a)(2)–(3).

To transfer control of the rail corridor, a railroad must notify the federal Surface Transportation Board ("STB") when it intends to abandon a rail line. *See* 49 U.S.C. § 10903(a); 49 C.F.R. §§ 1152.20–1152.22. When the railroad notifies the STB of its intent to abandon, a qualified "trail sponsor"—usually a county, city, or qualifying non-profit organization—may notify the STB of its interest in managing the railroad right-of-way for public recreational purposes under the rail-banking program. *See* 49 C.F.R. § 1152.29(a). If the railroad agrees to negotiate transfer of the right-of-way with the prospective trail sponsor, the STB then issues a Notice of Interim Trail Use ("NITU"). *Id.* § 1152.29(d)(1). A NITU is the governmental action that stays railroad abandonment while a sponsor uses a railroad right-of-way for trail use and blocks the vesting of state reversionary interests in the right-of-way. *Barclay v. United States*, 443 F.3d 1368, 1371 (Fed. Cir. 2006), *holding modified by Hardy v. United States*, 965 F.3d 1338 (Fed. Cir. 2020) (quoting *Caldwell v. United States*, 391 F.3d 1226, 1234 (Fed. Cir. 2004)).

After the STB issues the NITU, the railroad and trail sponsor enter into a  negotiated trail-use agreement, which defines the transfer and future operation of the rail corridor for recreational purposes and potential reactivation. *Id*. The rail-banking process under section 8(d) prevents state property laws that would otherwise take effect upon abandonment—*i.e.*, the extinguishment of the railroad easement for railroad purposes and the reversion of rights of way to abutting landowners— and creates a new easement that is legally distinct from the original easement granted to the railroad. *Caldwell*, 391 F.3d at 1229; *Preseault v. United States*, 100 F.3d 1525, 1550 (Fed. Cir. 1996) (en banc) (*Preseault II*). The new easement lasts in perpetuity or until the trail is no longer used for recreation or rail-line reactivation. *Caldwell*, 391 F.3d at 1234.

The federal government's takings liability for rail-banking transfers under section 8(d) is well-settled. *See Caquelin v. United States*, 959 F.3d 1360, 1364 (2020) (citing *Preseault I,* 494 U.S. at 11-17). If an adjacent landowner owns property underlying the right-of-way in fee simple, the federal government is liable for a taking when it prevents the property owner from asserting its state law reversionary rights once the railroad abandons the easement. *Ladd v. United States*,

---

$10,747,334 in total damages. *See* Pls.' Post-Trial Br. at 13–15. The Court resolves the difference in the amount of damages requested by considering the total amount set forth in plaintiffs' post-trial brief.

630 F.3d 1015, 1020 (Fed. Cir. 2010) (explaining that the STB's "issuance of the NITU is the ... government action in the rail-banking process that operates to ... preclude the vesting of state law reversionary interests in the right-of-way," thus denying the landowners possession of their property unencumbered by the easement).

In the classic rails-to-trails case, a "Fifth Amendment taking occurs if the original easement granted to the railroad under state property law is not broad enough to encompass a recreational trail." *Caldwell*, 391 F.3d at 1229 (Fed. Cir. 2004) (citing *Preseault II,* 100 F.3d at 1552). In many instances, the original easement granted to the railroad was limited to "railroad purposes only." *Preseault II*, 100 F.3d at 1543–44. If limited to railroad purposes, the original easement would cease to exist under state property laws once the railroad abandons the line and the landowner takes exclusive possession of its fee simple property. *See Preseault I*, 494 U.S. at 8. Under section 8(d)'s rail-banking program, however, federal law prevents extinguishment of the railroad easement when the STB issues the NITU and destroys state law reversionary interests. *See Caquelin*, 959 F.3d at 1364 (citing *Preseault II*, 100 F.3d at 1525). This is a taking for which the Fifth Amendment requires "just compensation." *Id; Ladd*, 630 F.3d at 1025.

### B.  Findings of Fact

This case concerns a 3.1 mile stretch of railroad corridor formerly operated by Norfolk Southern Railway Company ("Norfolk Southern") between Milepost CF-65.6 and Milepost CF-68.7 near downtown Greensboro, North Carolina. *See* Pls.' Pre-Trial Mem. ¶ 1. The original easement granted to Norfolk Southern was for "railroad purposes" only. *See* J. Stips. of Facts for Trial, ECF No. 228 ¶ 1.

In April 2019, Norfolk Southern agreed to transfer its interest in the railroad to the City of Greensboro (the "City") as a trail sponsor under section 8(d). *See* Pls.' Pre-Trial Mem. at 79; PX 178. On October 11, 2019, the STB issued a NITU to facilitate the transfer of the easement. *See* Norfolk Southern Railway Company—Abandonment Exemption—in the City of Greensboro, N.C., 2019 WL 5099688 (S.T.B.) (Oct. 11, 2019); PX 171. Thereafter, the City and Norfolk Southern executed a non-warranty deed transferring the corridor to the City for $8,500,000. *See* PX 177; J. Stips. of Facts for Trial, ¶ 7. Accompanying the deed was a survey map illustrating the geographic dimensions of the railroad corridor conveyed as 200-feet wide and extending 100-feet from each side of the centerline. *See* PX 177 Ex. B. at 1626. Norfolk Southern conveyed the entirety of its interests in the corridor to the City. *See* PX 177–78.

The City acquired the railroad corridor to build out an existing network of publicly-owned recreational trails in downtown Greensboro known as the "Downtown Greenway." *See* Pls.' Pre-Trial Mem. ¶ 11. In this trial and related cases, documentary evidence and testimony demonstrates that the City believes it owns the easement described in the survey, acts as though it owns the easement, and the City's course of conduct after entering the trail-use agreement reflects that understanding. *Id*. ¶¶ 12–13, 15, 17; *Agapion v. United States*, 167 Fed. Cl. 761, 774 (2023) (*Agapion I*); PX 144.1.

The 20 plaintiffs here owned property in fee simple that abuts and underlies portions of the 3.1 mile stretch of rail line that was encumbered by the trail use easement in 2019. *See* Pls.' Post-

Trial Br. at 1–2; United States' Post-Trial Br. at 1. The parcels of land and the owner of each parcel as of October 11, 2019—the date that the STB issued the NITU—are detailed below:

**1.    *1007 Battleground Avenue (Parcel No. 4079)*.** This parcel was owned by JESC, LLC on October 11, 2019. *See* PX 1 at 3; PX 64. The total parcel size is 0.931-acre or 40,554 square feet ("SF") and is zoned for commercial and multi-family residential uses. *Id*. at 16, 21–22. Before the taking, the highest and best use of this property was commercial development as either office or multi-family residential space. *Id*. The highest and best use after the taking remains the same. *Id*. at 22. The area of parcel number 4079 encumbered by the trail-use easement is roughly 10,602 SF. *Id*. at 33; Pls.' Pre-Trial Mem. ¶ 34.

**2.    *2419 Lawndale Drive (Parcel No. 15313)*.** This parcel was owned by GCP Real IV, LLC on October 11, 2019. *See* PX 2; PX 65. The total parcel size is 2.84-acres or 123,710 SF and is zoned for commercial and multi-family residential uses. PX 2 at 8. The property also contains a one-story commercial building totaling 12,202 SF, which has been utilized as a Golden Corral restaurant. *Id*.; Pls.' Pre-Trial Mem. ¶ 43. Before the taking, the highest and best use of this property was commercial use. PX 2 at 15. After the taking, the highest and best use remains commercial use. *Id*. at 16. The area of parcel number 15313 encumbered by the trail-use easement is 19,073 SF. *Id*. at 37; Pls.' Pre-Trial Mem. ¶¶ 45–47.

**3.    *1621 Battleground Avenue (Parcel No. 12257)*.** This parcel was owned by Guilford Builders Supply Co on October 11, 2019. *See* PX 3 at 3; PX 36. The total parcel size is 1.77-acres or 77,101 SF and is zoned for commercial use. PX 3 at 17–18. The property supports, among other things, a 11,529 SF multi-tenant retail building, numerous covered areas, canopies, loading platforms, a 2,400 SF equipment shed, and a 50,000 SF of concrete paving. *Id*.; Pls.' Pre-Trial Mem. ¶ 54. Before the taking, the highest and best use of the property was commercial and residential uses. PX 3 at 24. The highest and best use after the taking remains the same. *Id*. The area of parcel number 12257 encumbered by the trail-use easement is 39,947 SF. *Id*. at 44–45; Pls.' Pre-Trial Mem. ¶¶ 56–58.

**4.    *2309 Lawndale Drive (Parcel No. 15151)*.** This parcel was owned by Emily Elizabeth Owen on October 11, 2019. *See* PX 4 at 3; PX 67; Pls.' Pre-Trial Mem. ¶ 64. The total parcel size is 0.22-acre or 9,583 SF and is zoned for single-family residential use. PX 4 at 15, 19. The property contains a two-bed, one-bath single-family residence totaling 966 SF, along with a one-car detached garage. *Id.* at 17. Before the taking, the highest and best use of the property was residential use. *Id.* at 20. After the taking, the highest and best use remains residential use. *Id.* The area of parcel number 15151 encumbered by the trail-use easement is 3,876 SF. *Id.* at 29–30.

**5.    *1705 Battleground Avenue (Parcel No. 12253)*.** This parcel was owned by Goodhue Partners LLC on October 11, 2019. *See* PX 6 at 7; PX 69; Pls.' Pre-Trial Mem. ¶ 75. The total parcel size is 0.39-acre or 16,988 SF and is zoned for commercial and multi-family residential uses. PX 6 at 22, 28. The property contains a single-story building totaling 5,164 SF with a partially completed paved parking lot and a cell tower valued by the County at $112,500. *Id.* at 22–23. The building has a wood frame with brick siding on a concrete slab with "above average" finishes and currently houses an interior decorator's offices and showroom. *Id.* at 23; Pls.' Pre-Trial Mem. ¶ 76. Before the taking, the highest and best use of the property was

commercial development. PX 6 at 29. After the taking, the highest and best use remains commercial development. *Id.* The area of parcel number 12253 encumbered by the trail-use easement is 10,693 SF. *Id.* at 48; Pls.' Pre-Trial Mem. ¶¶ 78–80.

**6.** ***410 Hillside Drive (Parcel No. 4063).*** This parcel was owned by William and Dora Nelson on October 11, 2019. *See* PX 7 at 3. The total parcel size is 0.30-acre or 13,068 SF and is zoned for single-family residential use. *Id.* at 15–16, 20. The property contains a single-family residence totaling 1,000 SF, which includes a basement, porches, a detached garage, and a driveway. *Id.* at 15, 17. Before the taking, the highest and best use was low-density, single-family residential use. *Id.* The highest and best use of the property after the taking remains single-family residential use. *Id.* at 21. The area of parcel number 4063 encumbered by the trail-use easement is 6,200 SF. *Id.* at 29; Pls.' Pre-Trial Mem. ¶¶ 89–91.

**7.** ***2311 Lawndale Drive (Parcel No. 15150).*** This parcel was owned by Darlene R. Stanley on October 11, 2019. *See* PX 8 at 3. The total parcel size is 0.23-acre or 10,019 SF and is zoned for residential use. *Id.* at 3, 15–16. The property contains a single-story resident totaling 1,314 SF with three bedrooms, one full bath, a basement, and porches. *Id.* at 16–17. Before the taking, the highest and best use of the property was single-family residential use. *Id.* at 20. After the taking, the highest and best use of the property remains single-family residential use. *Id.* The area of parcel number 15150 encumbered by the trail-use easement is 3,512 SF. *Id.* at 29; Pls.' Pre-Trial Mem. ¶¶ 100–02.

**8.** ***414 Hillside Drive (Parcel No. 4065).*** This parcel was owned by Kenneth Plott and Cynthia Toy on October 11, 2019. *See* PX 9 at 3. The total parcel size is 0.18-acre or 7,841 SF and is zoned for single-family residential use. *Id.* at 3, 16. The property contains a single-family residence totaling 1,245 SF, which includes three bedrooms, one full bath, a basement, a driveway, an enclosed porch and wood deck, and a detached garage in the northwest corner of the backyard. *Id.* at 15, 17. Before the taking, the highest and best use of the property was single-family residential use. *Id.* at 21. After the taking, the highest and best use of the property would be low-density, single-family residential development. *Id.* at 20. The area of parcel number 4065 encumbered by the trail-use easement is roughly 2,750 SF. *Id.* at 29–30; Pls.' Pre-Trial Mem. ¶¶ 111–13.

**9.** ***2317 Lawndale Drive (Parcel No. 15147).*** This parcel was owned by H. Wayne and Faye Mohorn on October 11, 2019. *See* PX 18 at 3. The total parcel size is 0.28-acre or 12,297 SF and is zoned for single-family residential use. *Id.* at 3, 16; Pls.' Pre-Trial Mem. ¶ 120. The property supports a single-story residence totaling 1,470 SF, which includes three bedrooms, one full bath, an enclosed porch, an open porch, an attached storage room, and a driveway. PX 18 at 17. Before the taking, the highest and best use of the property was residential use. *Id.* at 20. After the taking, the highest and best use remains residential use. *Id.* The area of parcel number 15147 encumbered by the trail-use easement is 3,466 SF. *Id.* at 31–32; Pls.' Pre-Trial Mem. ¶¶ 122–24.

**10.** ***2205 and 2207 Fernwood Drive (Parcel Nos. 15157 and 15143).*** These abutting parcels were owned by Dr. Robert Tury on October 11, 2019. The size of the parcels and the area of take remain a source of continued confusion with none of the experts correctly calculating the

areas. For instance, Mr. Hickerson's estimates of the area of take and the parcel size of 2207 Fernwood Drive conflict with his own map. DX 6327 at 7, app.B fig. 3. Ms. Straup incorrectly depicts the area of take as wider than the parcel at 2207 Fernwood Drive. PX 258; DX 931 at 5; DX 1879 at 1,8. Dr. Kilpatrick accepts a measurement error in the plat and misinterprets another measurement, thereby inflating the size of the parcels. DX 257 at 8 fig. 6, 17; DX 1879 at 1, 8. Finally, Mr. Kimmel uses multiple, mutually inconsistent estimates. DX 47 at 18–19, 21, 34.

Relying on deed descriptions of the parcels and the survey map's description of the easement width, the Court finds as follows: the parcel sizes of 2205 and 2207 Fernwood Drive are 10,148.25 SF and 10,460.33 SF, respectively. Thus, the total size of the parcels is 20,608.58 SF. The area of take is 10,390.45 SF, and it lies entirely within 2207 Fernwood Drive. Nevertheless, both appraisers correctly assumed that the "larger parcel" consists of both two parcels. PX 257 at 16; DX 47 at 36. Before the taking, the highest and best use of the parcels was to support an office building. After the taking, the highest and best use of the parcels would be commercial development of the remainder property. *See* PX 257 at 44; DX 47 at 45.

**11.    *1707-A Battleground Avenue (Parcel No. 12252).*** This parcel was owned by Mary Anton on October 11, 2019. *See* PX 19 at 7. The total parcel size is 0.34-acre or 14,810 SF and is zoned for commercial use. *Id.* at 7, 26. The property supports a retail building totaling 2,608 SF that is used as an auto service garage, along with parking spaces and a paved driveway totaling 6,000 SF. *Id.* at 20. Before the taking, the highest and best use of the property was in its "as-is" developed state. *Id.* at 26–27. After the taking, the highest and best use is commercial re-development. *Id.* The area of parcel number 12252 encumbered by the trail-use easement is roughly 8,400 SF. *Id.* at 45; Pls.' Pre-Trial Mem. ¶¶ 144–46.

**12.    *1707-B Battleground Avenue (Parcel No. 12256).*** This parcel was also owned by Mary Anton on October 11, 2019. *See* PX 20 at 7. The total parcel size is 0.22-acre or 9,583 SF and is zoned for commercial use. *Id.* at 7, 20–21, 25. The property supports a single-story building totaling 1,495 SF that houses a salon called the "Brow Lounge," which provides manicure and pedicure services. *Id.* at 20, 22. The property also contains paving and thirteen parking spaces totaling 5,200 SF. *Id.* at 22; DX 48 at 25. Before the taking, the highest and best use of the property was commercial development. PX 20 at 26. After the taking, the highest and best use remains the same. *Id.* at 27. The area of parcel number 12256 encumbered by the trail-use easement is roughly 6,300 SF. *Id.* at 46–47; Pls.' Pre-Trial Mem. ¶¶ 155–57.

**13.    *1013 Battleground Avenue (Parcel No. 4072).*** This parcel was owned by Davenport Energy, Inc. on October 11, 2019. *See* PX 23 at 7. The total parcel size is 1.22-acres or 53,143 SF and is zoned as "light industrial." *Id.* at 7, 20; Pls.' Pre-Trial Mem. ¶ 164. Before the taking, the highest and best use of the property was commercial development. PX 23 at 25. After the taking, the highest and best use remains the same. *Id.* The area of parcel number 4072 encumbered by the trail-use easement is 36,441.10 SF. *Id.* at 33; Pls.' Pre-Trial Mem. ¶¶ 166–68.

**14.    *623 Eugene Court (Parcel No. 1442).*** This parcel was owned by One Step Further, Inc. on October 11, 2019. *See* PX 24 at 3, 15; PX 88. The total parcel size is 0.36-acre or 15,682 SF and is zoned as "central business" with a downtown development overlay. PX 24 at 15. The property contains a one-story office building totaling 5,038 SF (along with a parking lot and

wooden fence) and houses a not-for-profit entity. *Id.* at 14, 16. Before the taking, the highest and best use of the property was Class B office space. *Id.* at 3, 16, 19. After the take, there is no highest and best use for the parcel as it is "effectively useless" for practical future development. *Id.* at 41. The area of parcel number 1442 encumbered by the trail-use easement is 17,041 SF. *Id.* at 39–40; Pls.' Pre-Trial Mem. ¶¶ 175–77.

15.    ***2204 Battleground Avenue (Parcel No. 15300).*** This parcel was owned by Sam's Commercial Properties, LLC on October 11, 2019. PX 25 at 7; PX 89.[2] The total parcel size is 1.498-acres or 65,176.10 SF and is zoned as "commercial medium." PX 25 at 7, 19. Before the taking, the highest and best use of the property was as a vacant parcel with the potential for future commercial development. *Id.* at 24–25. After the taking, the highest and best use of the property would be commercial development. *Id.* at 25. The area of parcel number 15300 encumbered by the trail-use easement is approximately 18,684 SF. *Id.* at 33–34; Pls.' Pre-Trial Mem. ¶¶ 183–85.

16.    ***1450 Open Whilden Place (Parcel No. 60078).*** This parcel was owned by Whilden Place Homeowner's Association on October 11, 2019. *See* PX 26 at 3; PX 90; Pls.' Pre-Trial Mem. ¶ 191. The total parcel size is 8.53-acres or 371,567 SF and is zoned for multi-family residential use with a downtown development overlay. PX 26 at 3, 14–15, 18. The parcel supports a neighborhood of 63 single-family condominium homes but can support a total of 153 units. *Id.* at 10, 14, 16, 20. Before the taking, the highest and best use of the property was for multi-family residential development. *Id.* at 18–19. After the taking, the highest and best use remains the same. *Id.* at 19. The area of parcel number 60078 encumbered by the trail-use easement is approximately 103,200 SF. *Id.* at 38–29; Pls.' Pre-Trial Mem. ¶¶ 194–96.

17.    ***1304 Whilden Place (Parcel No. 6664).*** This parcel was owned by Helen C. Wood, LLC on October 11, 2019. *See* PX 27, 91; Pls.' Pre-Trial Mem. ¶ 202. The total parcel size is 0.34-acre or 14,810 SF and is zoned for multi-family residential use. *See* PX 27 at 16–18. The property also supports a single-family residence totaling 1,424 SF, which previously functioned as a duplex. *Id.* at 17–18. Before the taking, the highest and best use of the property was for use as a single-family residence. *Id.* at 21–22. After the taking, the highest and best use would be low- and medium-density residential development. *Id.* The area of parcel number 6664 encumbered by the trail-use easement is approximately 8,000 SF. *Id.* at 30–31; Pls.' Pre-Trial Mem. ¶¶ 205–07.

18.    ***2300 Battleground Avenue (Parcel No. 15297).*** This parcel was owned by Joseph Campbell on October 11, 2019. *See* PX 28 at 8; PX 92; Pls.' Pre-Trial Mem. ¶ 213. The total parcel size is 0.81-acre or 35,284 SF and is zoned as "commercial medium." PX 28 at 26. The property also contains a specialty auto service facility and an automatic carwash and storage areas. *Id.* at 22. Before the taking, continued use of the parcel in the "as is" condition would be the highest and best use of the property. *Id.* at 27–28. After the taking, the highest and best use of the parcel would be high-end commercial development. *Id.* The area of parcel number 15297

---

[2]    There is a discrepancy between plaintiffs' statements and those of their expert, Dr. Kilpatrick, regarding the identity of the owner of 2204 Battleground Avenue. *Compare* Pls.' Pre-Trial Mem. ¶ 180 (identifying the owner as "Sam's Commercial Properties, LLC"), *with* PX 25 at 7 (listing the "owner of record" as Battleground Storage Associates LLC."). The Court resolves any discrepancy regarding ownership in favor of representations contained in plaintiffs' pre-trial memorandum of facts and law.

encumbered by the trail-use easement is approximately 17,631 SF. *Id.* at 30–31; Pls.' Pre-Trial Mem. ¶¶ 216–18.

19.    *1420 Whilden Avenue (Parcel No. 60069).*  This parcel was owned by Colleen McNickle on October 11, 2019. *See* PX 29 at 3; PX 93; Pls.' Pre-Trial Mem. ¶ 224. The total parcel size is 0.14-acre or 5,898 SF and is zoned for medium-density residential development. PX 29 at 3, 17. The property supports a single-story condominium unit totaling 744 SF. *Id.* at 16–18. Before the taking, the highest and best use of the property was in its "as-is" state for use supporting a single-family condominium residence. *Id.* at 22. After the taking, the highest and best use will be for residential development. *Id.* The trail-use easement encumbers the entirety of the condominium unit, thereby constituting a "total taking" of the parcel. *Id.* at 30–32; Pls.' Pre-Trial Mem. ¶¶ 227–29.

20.    *416 Hillside Drive (Parcel No. 4066).*  This parcel was owned by Charissa R. Raynor on October 11, 2019. *See* PX 30 at 3; PX 94; Pls.' Pre-Trial Mem. ¶ 235. The total parcel size is 0.21-acre or 9,148 SF and is zoned for low-density, single-family residential development. PX 30 at 15–16. A one-story residential structure totaling 1,059 SF sits on the property, along with a driveway on the southern side of the property. *Id.* at 17. Before the taking, the highest and best use of the parcel was in its "as-is" state supporting a single-family residence. *Id.* at 20. This highest and best use remains the same after the taking. *Id.* at 21. The area of parcel number 4066 encumbered by the trail-use easement is approximately 2,831 SF. *Id.* at 29; Pls.' Pre-Trial Mem. ¶¶ 238–40.

21.    *404 Hillside Drive (Parcel No. 4060).*  This parcel was owned by Matthew Black on October 11, 2019. *See* PX 31 at 3; PX 95; Pls.' Pre-Trial Mem. ¶ 246. The total parcel size is 0.23-acre or 10,019 SF and is zoned for low-density, single-family residential development. PX 31 at 15–16. The property also supports a single-story home totaling 1,063 SF, along with a 500 SF unfinished basement and a driveway on the northern part of the property. *Id.* at 15, 17–18. Before the taking, the highest and best use of the parcel was in its "as-is" statute for use as a single-family residence. *Id.* at 21. After the taking, the highest and best use remains the same. *Id.* The area of parcel number 4060 encumbered by the trail-use easement is approximately 6,060 SF. *Id.* at 30–31; Pls.' Pre-Trial Mem. ¶¶ 249–51.

## C. Procedural History

The 20 plaintiffs across these six cases filed their operative complaints between 2020 and 2023. *See Agapion*, ECF No. 21; *Chapman*, ECF No. 7; *Goodhue*, ECF No. 9; *Mohorn*, ECF No. 152; *Wood*, ECF No. 15; *Black*, ECF No. 12. At varying points in 2020 and 2021, the parties jointly stipulated to each plaintiffs' ownership of the properties at issue. *See Agapion*, ECF No. 20; *Chapman*, ECF No. 11; *Goodhue*, ECF No. 10; *Mohorn*, ECF No. 12; *Wood*, ECF No. 17; *Black*, ECF No. 19.[3] Although the claims of other landowners were settled, settlement of these cases did not occur. *See Agapion*, ECF No. 48 at 1; *Goodhue*, ECF No. 104; *Mohorn*, ECF Nos.

---

[3]    The government submitted a filing that partially revoked its earlier stipulation to the parties' title. *See Mohorn*, ECF No. 62. The government's revocation, however, does not implicate any of the properties at issue in the cases covered by this opinion.

92, 99.[4]   Ultimately, the parties requested that a trial be held to determine the amount of just compensation owed to plaintiffs for the government's taking of their property. *See* Pls.' Status Report, ECF No. 208; United States' Statement Proposing Trial Date, ECF No. 209.  In April 2023, the Court issued an order and set trial for late September 2023.  *See* Apr. 11, 2023 Order, ECF No. 215.

Before the damages trial, the parties filed pre-trial briefs setting forth their proposed findings of fact and law. *See* United States' Pre-Trial Br.; Pls.' Am. Memorandum of Contentions of Facts and Law, ECF No. 241-1.[5]   The Court held a damages trial via remote videoconference from September 27 through September 29, 2023.[6]   After the trial, the parties submitted post-trial briefs in late 2023 and early 2024.  *See* Pls.' Post-Trial Br., ECF No. 277; United States' Post-Trial Br.; Pls.' Reply Br., ECF No. 282.  On April 23, 2024, the Court held closing arguments at the courthouse in Washington, D.C.  *See* Apr. 23, 2024 Order.

## II.    Overview of Trial Testimony

The four-day damages trial consisted of testimony from five witnesses.  Plaintiffs presented testimony from three expert witnesses: (1) Cynthia Straup; (2) Dr. John Kilpatrick; and (3) Charles Matthews.

Ms. Straup is the managing director of Straup Solutions, a geographic information systems ("GIS") mapping company. *See* Trial Tr. 44–46; PX 163.  Ms. Straup testified to a series of maps created by her firm that depicted the geographic dimensions of the properties and the easement obtained by the City from Norfolk Southern. *See* Trial Tr. 45–46, 59:8–20.  She noted that her maps and analysis were based on the survey attached to the non-warranty deed and valuation charts filed with the county. *Id.* 45:3–23, 54:4–24.  Based on these maps, Ms. Straup offered her opinions regarding the portions of plaintiffs' properties that are now encumbered by the City's trail-use easement. *Id.* 63:19–98:16; PX 90–98.

Plaintiffs also offered the testimony of Dr. Kilpatrick regarding his valuation of the twenty-one affected properties. Trial Tr. 172:12–15.   Dr. Kilpatrick possesses over 40 years of professional experience in the real estate industry and is a certified appraiser in forty-nine states, including in North Carolina. *See* PX 162; Pls.' Pre-Trial Mem. ¶¶ 19–21.  Dr. Kilpatrick offered testimony regarding his valuation opinions for each of the affected properties, which were also set forth in a series of appraisal reports. *See* PX 1–6, 7–9, 18–20, 23–31.

---

[4]    The cases of other landowners were dismissed with prejudice following the September 2023 trial in this case. *See Agapion*, J. Stip. of Dismissal with Prejudice for Certain Claims, ECF No. 304.

[5]    Plaintiffs filed an earlier pre-trial memorandum of facts and law in January 2023 (at ECF No. 186) but later submitted an updated memorandum to reflect certain changes that occurred in the intervening period. *See* Pls.' Consent Motion for Leave to Amend Plaintiffs' Memorandum of Contentions of Facts and Law, ECF No. 241.  The Court granted leave for plaintiffs to file this updated memorandum. *See* Sept. 11, 2023 Order, ECF No. 243.

[6]    The Court resumed the valuation trial on October 4, 2023 to hear the testimony of Charles David Matthews and Dr. John Kilpatrick. *See* Oct. 4, 2023 Order.  Mr. Matthews and Dr. Kilpatrick both testified remotely.

In his appraisal reports, Dr. Kilpatrick compared the "before" value of each property—the value of the property if owned in fee simple—against the "after" value of the property—the value of the property subject to the trail-use easement. *See* Trial Tr. 172:3–8. To value each property in the "before" condition, Dr. Kilpatrick used three well-established appraisal methodologies to determine fair market value: (1) the "sales comparison" approach; (2) the "income" approach; and (3) the "cost" approach. *See, e.g.*, PX 2 at 18–33. Dr. Kilpatrick then weighed these competing valuation approaches to arrive at a reconciled value for each property. *Id.* at 33. To value each property in the "after" condition, Dr. Kilpatrick subtracted the entire value of the land that was subject to the new easement from the "before" value. *Id.* at 38. Dr. Kilpatrick then added the costs to build a 10-foot privacy wall to finalize his just compensation figures. *Id.* at 40; Trial Tr. 199–201. In Dr. Kilpatrick's opinion, the costs associated with building a privacy wall served as a reasonable proxy for the severance damages to each plaintiffs' unencumbered land.

Plaintiffs also offered rebuttal testimony by Charles Matthews. *See generally* Trial Tr. 915–991. Mr. Matthews attacked the reliability of the valuation and methodology employed by the government's appraisal witness, Matthew Kimmel. *See* PX 244–45. Mr. Matthews possesses over 50 years of real estate appraisal and teaching experience, including experience with appraising properties subject to a trail-use easement. *See* PX 261; Trial Tr. 937:4–938:11. A licensed appraiser in North Carolina, Mr. Matthews testified that Mr. Kimmel incorrectly valued plaintiffs' property in the "before" condition by assuming that the property remained encumbered by the original rail easement rather than valuing each property as unencumbered by the rail easement. *Id.* 945:7–946:7. Mr. Matthews also testified that Mr. Kimmel's "after" valuations failed to meet the standard methodology used in a rails-to-trails appraisal because Mr. Kimmel assumed that the City would not use the full extent of its trail-use easement. *Id.* 954:14–18. Based on his analysis, Mr. Matthews claimed that Mr. Kimmel significantly undervalued the loss to plaintiffs' property resulting from the trail-use easement. *Id.* 964:17–25.

The government offered testimony from two expert witnesses: (1) Glen Hickerson; and (2) Mr. Kimmel. Mr. Hickerson served as the government's GIS-mapping expert. *See* United States' Post-Trial Br. at 14; Trial Tr. 498:1–3. At trial, Mr. Hickerson testified that he calculated the geographic boundaries of plaintiffs' properties by relying on the 2019 and 2022 Guilford County GIS parcel maps as base layers. *See* Trial Tr. 499:18–22, 501:21–22. He then overlayed the county parcel maps with aerial photographs and a valuation map prepared by the Interstate Commerce Commission ("ICC") in 1927 that reflected the railroad's easement interests along the corridor. *Id.* 521–525; PX 187. Mr. Hickerson summarized his calculations and findings in a series of expert reports submitted to the Court. *See* DX 6327–30. Based on his analysis, Mr. Hickerson concluded that Ms. Straup inflated the size of plaintiffs' properties because she relied on the 2019 survey map attached to the non-warranty deed—a map which Mr. Hickerson claims is inaccurate—rather than the 1927 maps prepared by the ICC. *See* Trial Tr. 535:14–536:15. Specifically, Mr. Hickerson testified that the geographic dimensions of the trail-use easement reflected in the 2019 survey map are larger than Norfolk Southern's actual easement ownership interests. *Id.* 535:14–18. In Mr. Hickerson's view, the 1927 valuation maps are more reliable sources for determining the extent of the original easement than the 2019 survey. *Id.* 537–38, 540.

The government also offered Mr. Kimmel's testimony regarding the value of plaintiffs' properties. A significant portion of Mr. Kimmel's testimony focused on perceived legal errors underlying Dr. Kilpatrick's valuation analysis. Mr. Kimmel testified that he reviewed Dr.

Kilpatrick's appraisal reports and created his own valuations of these properties when necessary. *Id.* 593:1–7. Mr. Kimmel testified that he believed Dr. Kilpatrick incorrectly applied the "before-and-after" methodology by failing to complete a true "after" valuation. *Id.* 427:15–428:15. In Mr. Kimmel's opinion, plaintiffs' properties suffered no diminution in value resulting from the trail-use easement because the "before" condition of each property should have been valued as though it was already subject to the railway easement. *Id.* 631:7–23; DX 2–5, 19–20, 31–34, 46–52, 59–61. Thus, Dr. Kilpatrick should have concluded that the "before" condition of each property—the value of the property subject to the railway easement—was identical to the "after" condition—the value of the property subject to the new trail-use easement. Trial Tr. 631:14–25.

Mr. Kimmel also criticized the methodologies employed by Dr. Kilpatrick to determine the "before" condition of the property. Mr. Kimmel testified that the use of the three valuation approaches was fundamentally flawed because Dr. Kilpatrick relied on unrepresentative comparative properties and offered almost no information in support of his application of each method. *Id.* 715:10–17, 738:1–12, 742–743; DX 1 at 47.

## III.    Discussion

The sole issue that must be resolved is the amount of just compensation owed to plaintiffs. *See* Pls.' Post-Trial Brief at 18 ("Whether Plaintiffs are owed compensation in these matters is not open for debate: liability in these matters has been established."); United States' Post-Trial Br. at 7 (recognizing plaintiffs' ownership of the "property adjacent to a 3.1-mile railroad corridor" and that the issue before the Court is the amount of just compensation owed for the rail-corridor conversion). The Court draws its factual findings from the complete record in this case and from related litigation.

### A.  Legal Standard for Just Compensation

The Fifth Amendment to the United States Constitution prohibits the federal government from taking private property for public use without paying the owner just compensation. U.S. CONST. amend. V. This Court has jurisdiction over takings claims against the United States, including those that occur under section 8(d) of the Trails Act. *See* 28 U.S.C § 1491; *Preseault I*, 494 U.S. at 11–17. If the government is found liable for the taking, the Court must determine the just compensation owed to the plaintiff. *See Cedar Point Nursery v. Hassid*, 594 U.S. 139, 147 (2021) ("When the government physically acquires private property for a public use, the Takings Clause imposes a clear and categorical obligation to provide the owner with just compensation.") (citation omitted); *see also Castillo v. United States*, 952 F.3d 1311, 1315 (Fed. Cir. 2020) ("[T]he government must provide just compensation to the owner of the reversionary rights eliminated by a Trails Act conversion.") (citation omitted).

The prevailing benchmark for just compensation is the "fair market value" for the "highest and best use" of the property. *Olson v. United States*, 292 U.S. 246, 255 (1934); *Rasmuson v. United States*, 807 F.3d 1343, 1346, n.1 (Fed. Cir. 2015). Generally, this is measured by the "price at which the property would change hands between a willing buyer and a willing seller" that are both "reasonably informed as to all relevant facts." *Julius Goldman's Egg City v. United States*, 697 F.2d 1051, 1054 n.3 (Fed. Cir. 1983) *(Egg City II)* (quoting *Miller v. United States,* 620 F.2d

812 (Ct. Cl. 1980)).  The constitutional mandate to pay just compensation—and the use of fair market value to establish the amount owed—is to ensure that the owner of the condemned property is made whole and no more.  *See United States v. 564.54 Acres of Land*, 441 U.S. 506, 516 (1979).

If the taking is caused by the burden of an easement, fair market value is determined using the "before-and-after" method—also known as the "Federal Rule"—which considers "the difference between the value of the property before and after the Government's easement was imposed."  *McCann Holdings, Ltd. v. United States*, 111 Fed. Cl. 608, 614 (2013) (quoting *Otay Mesa Property, L.P., v. United States*, 670 F.3d 1358, 1364 (Fed. Cir. 2012)).  When the taking is only partial, the amount of just compensation owed is the "diminution in value of the owner's remaining property resulting from the taking."  *Childers v. United States*, 116 Fed. Cl. 486, 497 (2013) (citation omitted); *Uniform Appraisal Standards for Federal Land Acquisitions* § 1.7.1.1 (6th ed. 2016) (the "Yellow Book").  The government may also compensate the property owner for the "cost-to-cure" when it is less than the property's reduction in fair market value.  *McCann Holdings, Ltd.*, 111 Fed. Cl. at 614, 622–23 (citation omitted).  However, the cost-to-cure is usually an alternative and independent measurement for calculating damages compared with the Federal Rule.  *United States v. Miller*, 317 U.S. 369, 375–76 (1943); *Vaizburd v. United States*, 384 F.3d 1278, 1286 (Fed. Cir. 2004).

Regardless of the method employed by the Court for measuring just compensation, the Court's mission remains the same: remedying "actual damages" suffered by the plaintiff for the taking.  *Gadsden Industrial Park, LLC v. United States*, 956 F.3d 1362, 1371 (Fed. Cir. 2020) (quotation marks omitted).  The plaintiff bears the burden of proving that he is entitled to just compensation and must demonstrate his damages "with reasonable certainty."  *Id.*; *see also Childers*, 116 Fed. Cl. at 497 (citing *Miller*, 620 F.2d at 812).  The Court will find that a plaintiff has carried his burden when he presents reliable market data supporting an estimated reduction in value to the injured property.  *See McCann Holdings, Ltd.*, 111 Fed. Cl. at 614.

The Court is not limited to any fixed methodology for determining fair market value and just compensation.  *See Yaist v. United States*, 17 Cl. Ct. 246, 257 (1989).  Rather, the Court's responsibility is to "synthesize in its mind the record before it, determine to what extent opinion evidence rested on fact, consider and weigh it all, and come up with figures supported by all the evidence."  *Washington Metro. Area Transit Auth. v. United States*, 54 Fed. Cl. 20, 36 (2002) (citation and alteration omitted).  If "a plaintiff has not provided evidence sufficient to determine just compensation," the Court "is not obligated to fashion its own award."  *Gadsden Indus. Park, LLC*, 956 F.3d at 1371.

### B.  The Parties' Valuation Estimates

Plaintiffs collectively seek an award of $10,747,334 as the just compensation for the government's taking of their properties (plus delay damages, litigation expenses, and attorneys' fees).  *See* Pls.' Post-Trial Br. at 13–14, 39.  To establish these damages, plaintiffs rely on (1) Ms. Straup's testimony regarding the geographic dimensions of plaintiffs' properties and the portions of those properties now burdened by the trail-use easement; and (2) the Dr. Kilpatrick's testimony and appraisal reports regarding the value of each plaintiffs' property both before and after it was encumbered by the trail-use easement.  *See* PX 1–6, 7–9, 18–20, 23–31, 90–98.

13

The government opposes any award of damages, embracing the opinion offered by Mr. Hickerson that Ms. Straup miscalculated the size of plaintiffs' properties by a total of 51,921.30 SF by relying on the 2019 map attached to the non-warranty deed rather than the 1927 ICC map. United States' Post-Trial Br. at 15; Trial Tr. 537:3–16, 538:7–23, 540:5–18. By enlarging the size of plaintiffs' property interests, the government contends that Ms. Straup incorrectly measured the width of the easement throughout the corridor and thus miscalculated the "area of take." *See* Trial Tr. 535:14–536:15; United States' Post-Trial Br. at 12–17. Mr. Hickerson claims that Ms. Straup committed other errors, such as relying on an unreliable county parcel map, utilizing an incorrect and overly simplistic mathematical formula for measuring irregular and curved parcels, and failing to perform exact calculations of the parcel dimensions by rounding up. *See* Trial Tr. 133–134, 138:1–25; United States' Post-Trial Br. at 17–18.

The government also attempts to undermine Dr. Kilpatrick's valuation findings on three independent grounds. First, the government claims that Dr. Kilpatrick's appraisal was fundamentally flawed because it was based on an incorrect understanding of the size and scope of the plaintiffs' properties and the easement. *See* United States' Post-Trial Br. at 20, 29–31. Second, Dr. Kilpatrick failed to properly calculate compensable damages because he did not follow the before-and-after method. *Id.* at 20–29. Third, Dr. Kilpatrick improperly adds severance damages to the total amount of just compensation owed. *Id.* at 31. On the second and third points, the government relies on Mr. Kimmel's criticism that Dr. Kilpatrick's valuations were incomplete and unreliable because he failed to provide sufficient explanation for his application of the sales comparison, income, and cost approaches and submitted his own appraisals of the property. *See* Trial Tr. 593:1–7.

For the following reasons, the Court finds that Dr. Kilpatrick's before-and-after valuation findings are reliable and thus informative for determining just compensation. The Court will adopt Dr. Kilpatrick's findings, except for his conclusions regarding severance damages (*i.e.*, the costs associated with building a privacy wall), which the Court finds are not supported by the record.

## C. Width and Exclusivity of the Easement

Plaintiffs believe that the 2019 survey map "defines the metes and bounds of what the City acquired as part of its purchase of the Railroad's easement rights, in conjunction with county level parcel data from 2019." *See* Pls.' Post-Trial Br. at 12. That is because the 2019 survey map depicts "the portion of land conveyed between the Railroad and the City" in the non-warranty deed. *Id.* at 19. For support, plaintiffs cite two earlier decisions by the Court that resolved Fifth Amendment takings claims arising out of the same underlying rails-to-trails conversion. *Id.* at 10. In both of those cases, the Court found that the 2019 survey map defined the geographic boundaries of the plaintiffs' property interests and the scope of the easement. *Agapion I*, 167 Fed. Cl. 761, 774 (2023); *Kotis Assocs., LLC v. United States*, 176 Fed. Cl. 346, 373 (2025).

The government disagrees that the 2019 map controls and argues that Dr. Kilpatrick's findings do not accurately reflect the nature and extent of the property rights taken. According to the government, Dr. Kilpatrick's valuation relied on Ms. Straup's erroneous calculations of the geographic dimensions of the plaintiffs' properties and the portions now encumbered by the trail-

14

use easement. *See* United States' Post-Trial Br. at 6. In turn, the government contends that Ms. Straup failed to correctly measure the dimensions of the trail-use easement because she relied on the 2019 survey map rather than the 1927 ICC map. *Id.* For this argument, the government points to a collection of property records which the government contends establishes that Norfolk Southern did not have the legal title to the easement width reflected in the survey along the full 3.1 miles of rail line. *Id.* at 9. Because Norfolk Southern never possessed an easement as wide as the one reflected in the 2019 survey map, the City did not obtain an easement as wide as the one outlined in the survey and thus the plaintiffs are not entitled to compensation for that which the City did not actually acquire.

In a valuation trial, the Court's objective is to determine the just compensation owed after considering all the evidence presented. *Otay Mesa Property, L.P. v. U.S.*, 779 F.3d 1315, 1321 (Fed. Cir. 2015). This requires the Court to consider the accuracy of any factual and legal underpinnings upon which the plaintiff relies to meet his burden of proof. *Gadsden Indus. Park, LLC*, 956 F.3d at 1368 ("Whether a taking under the Fifth Amendment has occurred is a question of law with factual underpinnings.") (citation omitted). If a plaintiff' case rests on unfounded or inaccurate statements of law or fact, the Court should account for such errors and deficiencies when making its just compensation determination. *Ultra-Precision Mfg. Ltd. v. Ford Motor Co.*, 338 F.3d 1353, 1359 (Fed. Cir. 2003). However, the Court will find that the plaintiff has met his burden of proof when he presents credible market evidence combined with accurate factual and legal assertions. *McCann Holdings, Ltd.*, 111 Fed. Cl. at 614, 622–26.

Confronted with materially identical circumstances, the Court in *Agapion I* found that the 2019 survey map "defines the geographic dimensions of the property interest acquired by the City." *Agapion I*, 167 Fed. Cl. at 774. Two years later, the Court reached the same finding in *Kotis Associates, LLC.*, concluding that the NITU reflects "the authoritative document through which Congress and the STB impose an ITUR easement [] and the corridor description adopted therein is binding on this Court." 176 Fed. Cl. 346, 371 (2025) (internal citations omitted). There, the Court determined that "[t]he NITU clearly adopts the Survey Map on which plaintiffs rely" to establish the geographic dimensions of the trail-use easement. *Id.* In reaching this decision, the Court found that NITU's adoption of the 2019 map was dispositive because the NITU is the sole governmental action that can affect a taking in a rails-to-trails scenario. *Id.* at 370. When the STB approved of the survey map, the agency authorized the scope of the new easement, and using Congress' grant of eminent domain power expanded what was assumedly a narrower railway easement. *Id.* at 371.

The same holds true here. Plaintiffs rely on the same 2019 map and NITU that the Court recognized as dispositive in *Agapion I* and *Kotis* for fixing the dimensions of the trail-use easement. At the same time, the government fails to persuade the Court that it should depart from its earlier decisions regarding the dispositive nature of the NITU and 2019 map. The Court thus finds that the plaintiffs have met their burden of proving that the 2019 survey map governs the dimensions of the new easement obtained by the City and thus reflects the taking of plaintiffs' property.

The parties also dispute whether the trail-use easement is exclusive. Plaintiffs contend that Dr. Kilpatrick's valuation opinions correctly found that plaintiffs do not retain the legal right to

15

use the encumbered portion of their properties. *See* Pls.' Post-Trial Br. at 29–35. Plaintiffs point out that the NITU imposes no limitation on the City's ability to convert the entire strip of the easement into a recreational trail, thereby depriving plaintiffs "of two of the most important sticks in the bundle of property rights: exclusion and improvement." *Id.* at 30. In opposition, the government argues that plaintiffs have failed to establish that the City's new easement is exclusive and thus deprives plaintiffs of the full use of the burdened property. *See* United States' Post-Trial Br. at 31–33. The government claims that the Trails Act and North Carolina law does not grant the trail sponsor with "exclusive control of the corridor." *Id.* at 32. Rather, the original landowners retain the right to occupy any portion of a railroad easement "not presently needed for railroad purposes." *Id.* (quoting *Carolina & N.W. Ry. Co. v. Piedmont Wagon & Mfg. Co.*, 51 S.E.2d 301, 306 (N.C. 1949) (internal quotation marks omitted). The government also asserts that plaintiffs "retain their right to control the remaining portion of their properties" because the City has no current plans to remove existing structures or improvements encroaching on the easement. *Id.* at 32.

For the same reasons explained in *Agapion I* and *Kotis*, the Court concludes that a fee simple landowner effectively loses all property rights within the corridor of a section 8(d) easement. *Agapion I*, 167 Fed. Cl. at 775; *Kotis Assocs., LLC*, 176 Fed. Cl. at 375. In short, a section 8(d) transfer grants the trail sponsor the authority to dictate the area of the easement that it needs to maintain the trail, and the federal government retains the authority to use the entire easement to reactivate the rail line. 16 U.S.C. § 1247(d). The ultimate result: the landowner retains no legal right to use the portion of the property encumbered by the trail-use easement. Although the City or STB may never order the removal of any existing structure, they have the authority to do so. *See Caldwell*, 391 F.3d at 1229. The loss of guaranteed legal rights is enough to find that the trail-use easement is exclusive because plaintiffs possess "no legal right to maintain an encroaching structure if either the STB or the City determine the encroachment conflicts with their use of the easement." *Agapion I*, 167 Fed. Cl. at 776.

In sum, plaintiffs have lost their guaranteed legal right to maintain structures within the corridor. Dr. Kilpatrick correctly based his valuation findings on plaintiffs' complete loss of guaranteed legal rights to use the property encumbered by the trail-use easement. *See* PX 1–6, 7–9, 18–20, 23–31; Trial Tr. 194:20–195:2. As the Court recognized in its two earlier opinions, Dr. Kilpatrick's valuation approach reflects "best appraisal practices and the Court's understanding of the Section 8(d) easement." *Agapion I*, 167 Fed. Cl. at 776; *Kotis Assocs., LLC*, 176 Fed. Cl. at 376.

### D. Calculation of Compensable Damages

The Court now considers the quantum of just compensation. As noted earlier, Dr. Kilpatrick calculated just compensation for each parcel as the sum of (1) the difference between the "before" and "after" value of the entire parcel; and (2) the cost of building a privacy wall between the trail-use easement and the remainder of the parcel. Trial Tr. 203:14–21. In Dr. Kilpatrick's view, the costs associated with the privacy wall serves as a proxy for the value of "severance damages" in this case. *Id*. 200:24–201:10; Pls.' Post-Trial Br. at 35–37.

On the other hand, Mr. Kimmel valued the parcels as though each parcel was subject to the railroad easement in the "before" condition. *See* United States' Post-Trial Br. at 34; United States'

Pre-Trial Mem. ¶¶ 47, 49–51, 56–61; Trial Tr. 612–613, 631.  Mr. Kimmel then concluded that the parcels did not decrease in value—and thus plaintiffs are not entitled to any compensation—because the "before" and "after" value are identical.  *Id.* 631:21–25; *see also* Pls.' Post-Trial Br. at 27–28.

Based on the evidence presented, the Court concludes that Dr. Kilpatrick's methodology and calculations regarding before-and-after value of the 21 properties are credible, except for his opinions regarding the inclusion of the privacy wall in his damages calculation.

### 1.  Dr. Kilpatrick's "before" and "after" value calculations are credible and methodologically sound.

The Court now considers Dr. Kilpatrick's valuation of the properties in the "before" condition.  Dr. Kilpatrick completed individual appraisals for each of the twenty-one properties. *See* PX 1–4, 6–9, 18–21, 23–31.  He later submitted an amended appraisal for the Tury property. *See* PX 257.  To estimate the "before" value of each property, Dr. Kilpatrick uses some combination of three different valuation approaches: the sales comparison, income, and cost approaches.  For the thirteen properties that were classified as either vacant or residential, Dr. Kilpatrick only used the sales comparison approach for estimating the "before" value.  *See* PX 1, 4, 7–9, 18, 23, 25, 26–27, 29–31.  For the remaining eight commercial properties, he used all three approaches and then reconciled those three calculations to reach a final valuation estimate.  *See* PX 2–3, 6, 19–20, 24, 28, 257.

Dr. Kilpatrick's method for evaluating the "after" condition of the properties considered the effect that the taking had on the remainder of the parcel.  For instance, Dr. Kilpatrick concluded that the remainder of a parcel that had no future possible use due to the trail-use easement (such as Parcel No. 4072) had an "after" value of zero.  *See, e.g.*, PX 23 at 36.  For these properties, the final just compensation value was simply equal to his "before" value.  *Id.* at 37.  However, Dr. Kilpatrick reached different valuation findings for properties whose non-encumbered portions retained some use despite the encumbrance imposed by the trail-use easement.  For those properties, Dr. Kilpatrick subtracted the land value of the area of the taking from the land value of the whole parcel.  *See, e.g.*, PX 1 at 38.  To finalize his just compensation findings for these properties, Dr. Kilpatrick added the costs associated with building a privacy wall along the border separating the trail-use easement and the plaintiff's unencumbered property.  *Id.* at 39–40.

Not surprisingly, Mr. Kimmel disagreed with Dr. Kilpatrick's appraisals.  Mr. Kimmel asserted that Dr. Kilpatrick's appraisal work is methodologically flawed and not consistent with established appraisal practices.  *See* DX 1, 6, 18–19, 26, 36, 54.  In Mr. Kimmel's opinion, the Court should accept his legal conclusion and find that the properties did not experience any decrease in value due to the trail-use easement because the "before" condition should reflect the prior railroad easement.  *See* Trial Tr. 612–613, 631.

The Court rejects the government's view that the "before" value of each of these properties should reflect the diminished value imposed by the railway easement.  The government's position rests on an erroneous legal interpretation that is contradicted by a line of cases concluding that the "before" condition is measured "as if the easement did not exist." *Moore v. United States*, 54 Fed. Cl. 747, 749 (2002); *see also Ladd v. United States*, 630 F.3d 1015, 1023 (Fed. Cir. 2010).  The

17

Court addressed the deficiencies of the government's argument in detail in *Kotis Assocs., LLC*, 176 Fed. Cl. at 377–78. Here, as in *Kotis*, the Court is not persuaded by the government's theory.

The Court also disagrees with the government's argument that Dr. Kilpatrick failed to properly apply the sales comparison, income, and cost approaches when valuing the properties in the "after" condition. *See* United States' Post-Trial Br. at 14. Dr. Kilpatrick correctly valued each property by reducing the value of the remainder parcel by the value of the area encumbered by the trail-use easement. As discussed above, plaintiffs retained no legal rights in the encumbered portion of the property. *See Caldwell*, 391 F.3d at 1229. And as the Court recognized in *Agapion I* and *Kotis*, this approach reflects best appraisal practices in the section 8(d) easement context. *Agapion I*, 167 Fed. Cl. at 776; *Kotis Assocs., LLC*, 176 Fed. Cl. at 376.

Next, the government asserts that Dr. Kilpatrick's analysis is "unsupported by actual market evidence and is therefore unreliable" because he allegedly failed to properly apply the sales comparison approach to his "before" valuations. *See* United States' Post-Trial Br. at 20. First, the government alleges that Dr. Kilpatrick's use of comparable sales was improper when appraising 1707-A Battleground Avenue because those comparisons involve such a wide range of values that cannot be used as credible indications of the value of the subject property. *Id.* Second, the government attacks Dr. Kilpatrick's valuations of 410 and 414 Hillside Drive as not credible because Dr. Kilpatrick valued the smaller and more irregular parcel at more than twice the per square foot value of the larger property. *Id.* at 21.

The Court concludes that Dr. Kilpatrick reliably used the sales comparison approach. A careful review of the relevant appraisal reports demonstrates that Dr. Kilpatrick accounts for the various ways that the subject property may differ from each of the comparable sales. PX 7 at 22–25; PX 9 at 22–25; PX 19 at 30–34. The fact that the selected comparable sales differ from the subject property in a variety of ways should come as no surprise: land is unique, and no two parcels are identical. In applying the sales comparison approach, Dr. Kilpatrick accounts for these differences with upward or downward adjustments in value. *See* PX 7 at 25; PX 9 at 25; PX 19 at 34. Dr. Kilpatrick reasonably selected comparable sales for each of the subject properties and consistently applied a well-established approach of adjusting for the dissimilar characteristics of the selected properties.

The government also attacks Dr. Kilpatrick's use of the income and cost approaches. *See* United States' Post-Trial Br. at 21–22. On the income approach, the government argues that the comparable properties that Dr. Kilpatrick selected to estimate the market rent for 2300 Battleground Avenue are too dissimilar from the subject property to provide an accurate basis for formulating a precise estimate. *See* United States' Post-Trial Br. at 22. The government also claims that Dr. Kilpatrick incorrectly used a national survey rather than local market data to determine the market capitalization rate for each property. *Id.* at 23.

The Court finds that Dr. Kilpatrick's methodology and application of the income approach was sound. The expert reports that he prepared for 2300 Battleground Avenue detail how the various comparable properties differ from the subject property and how those differences affected his valuation. *See* PX 28 at 34–36. Further, as the Court recognized in *Kotis*, an appraiser's reliance on a national survey in lieu of local market data is reasonable. 176 Fed. Cl. at 383. In

18

these circumstances, Dr. Kilpatrick's use of national survey data was reliable.  *See Franconia Assocs. v. United States*, 61 Fed. Cl. 718, 765 (2004).

On the cost approach, the government claims that Dr. Kilpatrick neglects to provide any explanation supporting his application of this valuation approach, thereby undermining its reliability.  *Id.* at 21.  The Court disagrees.  In his appraisal reports, Dr. Kilpatrick adequately explains both how the cost approach is used and how he applied it to each property.  *See, e.g.*, PX 2 at 27–32.  Dr. Kilpatrick describes how to complete a cost approach valuation.  *Id.* at 27.  He also details the various comparative properties that were selected, how they differ from the subject property, and the adjustments that were made to reconcile the properties into a final valuation.  *Id.* at 31.

### 2.  The plaintiffs are not entitled to recover the cost of building a privacy wall.

The government also objects to Dr. Kilpatrick's method of calculating severance damages, claiming that his estimates are not supported by the record and amount to a windfall.  *See* United States' Post-Trial Br. at 25.  Specifically, the government contends that Dr. Kilpatrick's method of adding the cost of building a privacy wall along the entire length of each border that the property shares with the easement is the exact same approach to estimating severance damages that was considered and rejected in *Agapion I* and *Kotis*.  *Agapion I*, 167 Fed. Cl. at 776; *Kotis Assocs., LLC*, 176 Fed. Cl. at 382.

In response, plaintiffs argue that the Dr. Kilpatrick's "after" condition does not account for the full extent of the diminution in value that they suffered due to the trail-use easement.  Pls.' Post-Trial Br. at 26; Trial Tr. 199:24–200:3.  By adding in the cost of building a privacy wall to the amount of just compensation, plaintiffs would be compensated for the full loss in value that they have suffered.

The Court agrees with the government's ultimate position that Dr. Kilpatrick's inclusion of the privacy wall as a proxy for severance damages is not justified and would overcompensate the plaintiffs.  To their credit, plaintiffs attempt to distinguish the estimate of severance damages in this case from the proposed severance damages that were also rejected in *Agapion I* and *Kotis*.  Unlike in those cases, plaintiffs here point to the portion of Dr. Kilpatrick's testimony in which he states that his calculations did not result in double compensation because his original "after" calculations do not include severance damages.  *See* Pls.' Post-Trial Br. at 28; Trial Tr. 206:18–24.

Ultimately, an award of severance damages in this case fails for reasons similar to those expressed in *Agapion I* and *Kotis*: just compensation is limited to making the landowner whole for the value of their property that was taken.  In cases where the property interest that is taken comes in the form of an easement, the typical approach to adducing just compensation requires a valuation of the property just before the easement and a valuation of the property just after the easement.  *See Otay Mesa Prop. L.P. v. United States*, 670 F.3d 1358, 1364 (Fed. Cir. 2012).  The difference between the two valuations represents the decrease in fair market value arising from the encumbrance and thus represents the just compensation that is due to the owner.  *See Pressly v. United States*, 172 Fed. Cl. 264, 268 (2024) (citing *United States v. Miller*, 317 U.S. 369, 376 (1943)).  This calculation should consider all damages that the property suffered from the easement, including the loss of privacy and the right to exclude.  *See Miller*, 317 U.S. at 375–76

(observing that in the event of a partial taking an owner must be compensated for any loss of value arising from the relation of the whole parcel to the part taken).

Here, as in *Agapion I* and *Kotis*, Dr. Kilpatrick deviated from the standard calculation for the reduction in fair market value used to determine just compensation. *See* Trial Tr. 443:6–23. Instead of subtracting the "after" value of the property from the "before" value, Dr. Kilpatrick added the cost of building a privacy wall to the final just compensation figures. *See, e.g.*, PX 31 at 35; Trial Tr. 199:24–200:3, 201:14–22. Dr. Kilpatrick concluded that the amount associated with building the privacy wall was justified because it approximated the cost-to-cure the resulting loss of privacy. *See* Trial Tr. 199:24–200:3.

The Court is not persuaded that Dr. Kilpatrick's additional cost-to-cure calculation accurately reflects the just compensation owed on these facts. On these facts, a damages award that allows for both the before-and-after approach *and* the cost-to-cure approach would result in a double recovery because plaintiffs would not only receive the compensation for the lost value of their properties but would receive additional compensation for the cost to avoid that lost value. *See Miller*, 317 U.S. at 375–76. These competing approaches for calculating damages are acceptable when used on their own. However, using them together—without a persuasive showing that explains why both are necessary—likely leads to double compensation. *See Agapion I*, 167 Fed. Cl. at 777. Accordingly, the Court declines to award cost-to-cure damages for the reasons articulated in *Agapion I* and *Kotis* and finds that the before-and-after method correctly reflects the just compensation that is owed to these plaintiffs.

Based on the entire record, the Court adopts the following amounts (before interest) as the just compensation owed to these twenty plaintiffs:

| | BEFORE VALUE | AFTER VALUE | JUST COMPENSATION |
|---|---|---|---|
| **Chapman** | | | |
| 1007 Battleground Avenue | $1,143,017 | $859,422 | $283,595 |
| **Agapion** | | | |
| 2419 Lawndale Drive | $3,991,995 | $3,511,575 | $480,420 |
| 1621 Battleground Avenue | $2,682,004 | $1,663,548 | $1,018,456 |
| 2309 Lawndale Drive | $144,643 | $124,947 | $19,696 |
| **Goodhue** | | | |
| 1705 Battleground Avenue | $1,296,676 | $197,726 | $1,098,950 |
| 410 Hillside Drive | $194,823 | $160,041 | $34,782 |
| 2311 Lawndale Drive | $168,368 | $160,009 | $8,359 |
| 414 Hillside Drive | $229,998 | $198,648 | $31,350 |
| **Mohorn** | | | |
| 2317 Lawndale Drive | $160,210 | $149,119 | $11,091 |

| | | | |
|---|---|---|---|
| 2205 and 2207 Fernwood Drive | $632,868 | $398,457 | $234,411 |
| 1707-A Battleground Avenue | $895,701 | $194,114 | $701,587 |
| 1707-B Battleground Avenue | $269,860 | $92,628 | $177,232 |
| 1013 Battleground Avenue | $1,398,153 | $0 | $1,398,153 |
| 623 Eugene Court | $671,874 | $0 | $671,874 |
| 2204 Battleground Avenue | $1,921,033 | $1,370,990 | $550,043 |
| 1450 Open Whilden Place | $1,868,315 | $1,349,404 | $518,911 |
| **Wood** | | | |
| 1304 Whilden Place | $176,563 | $137,923 | $38,640 |
| 2300 Battleground Avenue | $2,056,315 | $566,485 | $1,489,830 |
| 1420 Whilden Avenue | $73,649 | $22,121 | $51,528 |
| **Black** | | | |
| 416 Hillside Drive | $257,905 | $224,584 | $33,321 |
| 404 Hillside Drive | $213,034 | $151,161 | $61,873 |
| **TOTAL** | | | $8,914,102 |

## E.  The Appropriate Rate of Interest

As a component of just compensation, plaintiffs are also entitled to interest payments to account for the delay between the time of the taking and payment for the taking. *See Kirby Forest Indus., Inc. v. United States*, 467 U.S. 1, 10 (1984).  This Court has previously determined that Moody's Aaa Corporate Bond rate with annual compounding interest is appropriate to ensure just compensation in rails-to-trails cases. *See Hardy v. United States*, 138 Fed. Cl. 344, 356 (2018); *Kotis Assocs., LLC*, 176 Fed. Cl. at 379–80.  Consistent with that reasoning, the Court finds that plaintiffs are entitled to the Moody's Aaa Corporate Bond rate with annual compounding interest.

## CONCLUSION

To summarize, the Court finds that plaintiffs have met their burden of proving their claims for just compensation and awards compensation in the amount of **$8,914,102** with interest calculated using Moody's Aaa Corporate Bond rate, compounding annually.

Plaintiffs are **ORDERED** to file any motion requesting attorneys' fees and litigation expenses within 30 days of this opinion.  The government is **ORDERED** to file any response to plaintiffs' motion for fees and expenses within 30 days after plaintiffs file their motion.  No extensions will be granted absent a detailed showing of extraordinary circumstances.  The Court further cautions the parties that any appeal of this opinion will not delay the adjudication of any award of fees and expenses. *See Kotis Assocs., LLC v. United States*, 179 Fed. Cl. 650, 655 (2025) (Smith, J.) ("In sum, a prevailing party's request for attorneys' fees and expenses qualifies as an ancillary post-judgment inquiry that properly resides with the Court notwithstanding an appeal on the merits of the action."); *Bradley v. United States*, 179 Fed. Cl. 660, 673 (2025) (Tapp, J.) (the

21

Court of Federal Claims retains jurisdiction to adjudicate a motion for fees under the Uniform Relocation Assistance and Real Property Acquisition Policies Act (URA) despite an appeal of the underlying judgment regarding liability).

The parties are **FURTHER ORDERED** to file a joint status report within 14 days of this opinion advising the Court of any other matters that need to be addressed to fully adjudicate this case.

Under Rule 54(b) of the Rules of the United States Court of Federal Claims, there being no just reason to delay, the Court **DIRECTS** the Clerk of the Court to enter **JUDGMENT** in *Agapion, et al. v. United States*, No. 19-1596; *Chapman Spring/Garden, LLC, et al. v. United States*, No. 19-1942; *Goodhue Partners, LLC, at al. v. United States*, No. 21-87; *Mohorn, et al. v. United States*, No. 21-546; *Helen C. Wood, LLC, et al.  v. United States*, No. 21-2143; and *Black, et al. v. United States*, No. 22-10 for the plaintiffs consistent with this opinion.

**IT IS SO ORDERED.**

s/ *Loren A. Smith*

Loren A. Smith,
Senior Judge

22